## HARDY v. HARBIN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF CALIFORNIA.

No. 14.  Argued October 15, 1874. — Decided November 16, 1874.

After a careful examination of the proof relating to the identity of the appellants' ancestor with the grantee from the Mexican government, the court affirms the judgment of the court below, without deciding the questions of law.

The case is stated in the opinion.

Mr. Justice Hunt delivered the opinion of the court.

The appellants are the children of John Hardy.  They allege that to their ancestor, under the assumed name of Thomas M. Hardy, the Mexican government issued a grant, October 23, 1843, for the premises in controversy; that the appellees, purchasers under a void sale of Hardy's interest, procured the commission, under the act of the 3d of March, 1851, to confirm to them the lands so granted as aforesaid to Hardy.  The bill prays that the appellees may be compelled to convey to the appellants. .

A demurrer to the bill was interposed upon the ground that the defendants were innocent purchasers, having no knowledge of the fraudulent character of the administrator's sale under which the confirmees purchased.  The Associate Justice of the Supreme Court, who heard and decided the demurrer, overruled it, on the ground that under the allegations of the bill the sale at which the appellees purchased was absolutely void.

The demurrer having been overruled, an answer was put in which denies that the complainants (the appellants here) are the legal representatives of the Hardy to whom the grant was made; denies the alleged frauds; denies all knowledge or notice on the part of the defendants of such frauds if they were committed, and all knowledge or notice of the invalidity of the proceedings in the Probate Court, under whose order of sale they became purchasers.

This answer raised issues of fact and of law — of fact as to the identification of the Hardy to whom the grant was made with the Hardy whose heirs the complainants are admitted to be; of law, whether purchasers at a sale made by a court having no jurisdiction of the person or subject matter, can shield themselves under a plea of purchase in good faith, without notice of the invalidity of the decree under which the sale was made.

The district judge, sitting as circuit judge, entered a decree dismissing the bill upon the ground that the defendants were purchasers of parties holding the legal title — that is, the patent of the United States — and that they had no notice of the invalidity of the title of their vendors upon which the confirmation was made.

From this decree the complainants appeal to this court.

The points of law raised are —

First, That the complainants (children of John Hardy) at the date of the death of Hardy in California, in 1848, were aliens, and incapable of taking his real property by descent, and this both by the common law and the Mexican law.

Second, That the defendants are innocent *bona fide* purchasers for value without notice from the patentees, and are therefore protected in their possession. Upon this point the district judge, sitting as circuit judge, held with the defendants and dismissed the bill.

The question of fact is the identity of the two Hardys described in the evidence, or rather the union of the names of John Hardy and Tomas M. Hardy in one man, and that man, John Hardy, the father of the complainants.

The question of fact lies at the bottom of the case. If it should be held that aliens may inherit, that would be of no influence should it be decided that the complainants are not the children of the man who called himself Tomas M. Hardy.

Should it be held that the defendants are not innocent purchasers without notice, or that if such, that fact does not constitute a defence to the action, we should make no step towards a conclu-

sion, unless we also decided that the complainants were the children of the man entitled to the grant.

If it is found that the complainants are such children, the other questions arise. If it is found that they are not, the case is ended. In any aspect the question of identity arises and must be decided, and it is manifest from the suggestions already made that it is the point that should be first determined. We proceed to its consideration.

A person describing himself as Tomas M. Hardy died in California, in 1848, having received a land grant as a soldier in the Mexican service.

The children of John Hardy, of Canada, undertake to show that this person was their father.

John Hardy was a mechanic, born in the year 1801, who left Canada in the year 1831 and never returned. His wife had died not long before, leaving three young children, of whom the plaintiffs are survivors.

In seeking a solution of the question before us the inquiries at once present themselves,—

Why did he leave Canada? Was there any reason for changing his name?

He left Canada, in the language of the old tales, to seek his fortune. His wife, the daughter of a respectable clergyman, had died. Although not in want or destitution, he was not as successful in business as he wished to be. The disposition of her property by his mother did not please him. He had sought to interfere with it more officiously than pleased the mother, and she had given it to her other children, omitting to give him any portion. It was rumored also that he desired to marry the sister of his deceased wife, and that his offers in this respect were declined. These, we believe, are the only reasons shown for his leaving Canada.

These circumstances furnish the answer to the other inquiry suggested, and show that no reason existed for a change of name. He had committed no crime which compelled him to conceal his departure. There was no case of affection betrayed of which he desired to escape the consequences. He left openly, without concealment, with the knowledge of his friends, and with no attendance of crime, disgrace or dishonor. He had some conversation, as witnesses state, in which he declared that his friends would not hear from him until he was in better circumstances, and that he would change his Christian name, retaining the name of Hardy.

We place little value on the evidence of these trivial circumstances, given thirty or forty years after the occurrence, there being nothing at the time, or occurring since, to impress the conversation on the mind of the witness. That a man from any cause, desirous of concealing himself from his relatives, should retain his family name and seek to effect that object by changing his Christian name only, we think is hardly credible.

If we correctly understand the evidence no witness who ever knew or saw John Hardy in Canada also saw Thomas M. Hardy, who died in Benicia in 1848, and identified them as the same person. There is, however, evidence that John Hardy was in the Southern States and in Mexico at periods several years after leaving Canada. A number of witnesses testify to meeting a Mr. Hardy in various parts of Mexico, at different times from 1839 to 1846. Mr. Galbraith Lindsay testifies that in the winter of 1836–7, in Natchez, Mississippi, he frequently saw a man calling himself John Hardy, with whom he talked about persons and affairs in Canada, and was satisfied that he knew the persons and places of which he spoke, and that he was John Hardy. Lindsay was in Natchez four months on this occasion, and saw Hardy at different times during a period of four weeks. Two observations suggest themselves in relation to his evidence. 1st. That Hardy had not at that time made any change of name. He called himself, he says, John Hardy. If from the motives of anger or disappointment suggested, he determined to change his name, he seems to have reconsidered the determination, and at this time bore his true name.

2d. Hardy told the witness that he had come down the river, and that he had worked as a carpenter, repairing boats or building boats up the river. It does not appear that he told him that he had been a soldier in the Mexican service, or that he had been in or had seen the battle of San Jacinto. Although he might not have desired to proclaim this fact in the Southern States, would he have been likely to omit so important a feature of his life in his frequent conversations with his newly found countryman? Thomas M. Hardy, it is pretty clearly shown by the evidence of Baldridge, was in the Mexican service at the battle of San Jacinto, which occurred on the 21st of April, 1836, or witnessed the battle. Again. Would one who had taken the Mexican side in that contest be likely to return at once to the Southern States, where, as all know whose recollection goes back to that period, the Texan excitement was intense?

If we suppose that this conversation and recognition by Lindsay occurred at the beginning of the year 1836, the difficulty seems to be equally great. He conferred with Lindsay about his pursuits and employment, and was advised by him to go into the country and pursue his business as a hewer, where he could obtain good wages. No suggestion of Texas or Mexico passed between them. He came from up the river, and it is difficult to believe that before April of that year he would have drifted down the river, have passed through Texas, and entered into the uncongenial service of Mexico, and been present, on the 21st of that month, at the battle of San Jacinto. One or the other of the embarrassments suggested must have existed if this man was the same one who afterwards obtained the land grant in question.

Testimony is given by Thomas Hardy, a cousin of John Hardy, to the effect that in 1847 he received a letter from John Hardy signed with that name, and post-marked Monterey, California. The letter stated that the writer was building a mill, had a block of land in California, and wanted his son to come out; stated that he had reached California by the way of Texas, and witness thinks by way of Mexico; that he had done well, and we could all get rich if we would come out there. The substance of the letter the witness communicated to John Hardy's son, and acknowledged to Hardy the receipt of the letter.

Without intending an imputation upon the veracity of the witness we may say that this evidence is open to several criticisms.

1st. It is an unfortunate circumstance that the letter is not produced, or that a most diligent search has not been made for it.

2d. The letter was written and received seventeen years before the witness testifies to its contents. He is a member of the family making the claim, and may be assumed to be familiar with the hopes, wishes, and traditions of the family, and with their theories on the subject. Although he has no interest in the claim it is not improbable that these circumstances may have given to his evidence a point and particularity that it would not otherwise possess.

3d. Alexander, the son, was then twenty-two years of age, having been born in 1825, according to the allegation of the bill. Why did he not accede to his father's request? Why did he not strike out as his father had done, and with a prospect before him so much better than his father had? The evidence does not give us the reason. No attention seems to have been paid to the invitation by the son or by the family. That this should be seems

scarcely consistent with the idea of the actual receipt of such a letter.

4th. The letter purported to come from Monterey in 1847. Now, at that time, Thomas M. Hardy lived on the Cache Creek, in the Sacramento region, one hundred and fifty or two hundred miles from Monterey, which was on the coast. That he lived there during that year, and in 1848, until his death, and for several years previous, is proved by numerous witnesses. He there had his ranch, his horses, his mules and much other property.

The letter stated that he had built a mill and had a block of land. The presumption is that he wrote and sent his letter from the place where he resided; that he was building his mill there, and that his block of land was at the same place. Of course this is not certain, because he may have built in one place and lived in another one hundred or two hundred miles distant; his land may have been distant both from his mill and his residence, or he might have had his letter mailed at a place far off from where he wrote it. All these suggestions are possible but not probable, and the intendments of law are against them. For these reasons we do not attach much importance to the letter said to have been received by Thomas Hardy in 1847.

It should be added in support of the statement of the witness that he testifies that some friends of the family had been in the Mexican service.

In this connection may be considered the evidence of Mr. Gillespie, offered to show that John Hardy was at Monterey, and that he was the same man who lived on the Cache Creek. Mr. Gillespie, an officer of the United States sloop of war Cyane, testifies that a Mr. Hardy was in the service on that vessel in June, 1846; that he saw him also at San Diego and Los Angeles, and afterwards at his place at the mouth of the Feather River, where he ferried Commander Stockton and himself across the river in July, 1847, at his ranch, known as Hardy's ranch. Los Angeles and San Diego are some four hundred miles distant from the Cache Creek, on which Hardy was a resident during the years 1842, 1843, 1844, 1845, 1846 and 1847, as deposed by many witnesses. That Mr. Gillespie thus testifies that he was on board his vessel, and was at San Diego and Los Angeles in 1846, and that the same man was in the Feather River region (which is the same as the Cache Creek region) in 1847, is but another instance of the irreconcilable character of the evidence before us.

That Hardy was in Cache Creek, Sonoma region, during the

years 1842, 1843, 1844, 1845 and 1846, as well as in 1847 and 1848, was sworn to by Davis, by Fallon, by Leese, by Bidwell (who says he saw him every day from 1843 down to 1847), by Sutter and many others. In his prayer for the grant to the Mexican government, which bears date of September 20, 1843, he certifies that he was then established on the frontier of Sonoma. The Hardy on the Cyane, at San Diego and Los Angeles, and who wrote home from Monterey, if any one did, could scarcely have been the same man who made this petition and received the grant and lived during all these years on the Cache Creek. Other witnesses speak of knowing a Mr. Hardy in the southern part of California in 1844, 1845, 1846. If there was such a man, he may have been John Hardy, but he was not Thomas M. Hardy.

The evidence of Lindsay and Gillespie, which we have thus considered, and the evidence of Thomas Hardy that he received a letter from John Hardy, post-marked Monterey, which we have also considered, are the only pieces of testimony in the case that approach to the character of direct evidence. That they are not very direct is apparent, and that they are not entitled to any considerable weight we have endeavored to show.

We will now refer to the circumstances in evidence which the complainants think entitle them to a decree in their favor.

The complainants give great weight —

1st. To the evidence that the handwriting of the name Hardy, attached to the *espediente* and the "loose paper" on which the grant was made, is the handwriting of John Hardy, although the name signed is that of Tomas M. Hardy.

2d. To the evidence that the peculiarities of person, of habits and manners exhibited by John Hardy were exhibited also by Tomas M. Hardy; and,

3d. To his declarations that he was from Canada, and had left a family there.

As to the first point. We cannot but think that there is great doubt of the principle of this rule of evidence. The man being ascertained, it is competent to prove that a signature in question is his by those who have seen him write and know his handwriting. Although a comparison of handwritings is not generally allowable, the evidence of a witness is based upon a mental comparison of the writing presented with that before seen by him. But it is a different proposition when the identity of a man is to be established by proving that a paper whose origin is disputed looks like one which he is proved to have signed.

In relation to comparison of handwritings, *i.e.* where genuine signatures are put in evidence to enable the jury to judge by comparison, Bennett, J., in *Adams* v. *Field*, 21 Vt. R. 256, says: "Those having much experience in the trial of questions depending upon the genuineness of handwriting will not require to be reminded that there is nothing in the whole range of the law of evidence more unreliable or where courts and juries are more liable to be imposed upon."

In the present case the evidence of this character is entirely unreliable. It is given by persons in Canada unskilled in the subject, but who from relationship to John Hardy, or early acquaintance with him, seem to be supposed to be especially qualified to speak on the subject. Some men are called who claim to be skilled in the subject of genuine handwritings, and who have experience in comparison of handwritings. No intelligent court should be willing to base a judgment on evidence so little satisfactory as this evidence is as given in this case. A note for five dollars and fifty cents, signed by John Hardy, bearing date in 1831, and proved by some witnesses to have been signed by him, is taken as the standard. This note is not admitted to be genuine. (See 1 Green. Ev. § 577.) The proof is in 1864 of a signature made in 1831. The competency of this evidence is quite doubtful. A writing to Mr. Leese is also produced. The body of the note is plainly in a different handwriting from the signature, and was so proved to be, and yet some of the experts who assume to identify the signatures as made by one man are not able to state whether it was written by the same hand that signed the note. Hardy was a mechanic not much accustomed to writing while at home, and his signature to the note is of that stiff, unpractised character common to the signatures of such men. Although the letters proving the signature of Tomas M. Hardy are in many instances like those in the signature of John Hardy, the signature is in its general appearance more easy and flowing than that of John Hardy.

Again. How is it possible that John Hardy signed the papers containing the statements to be found in these documents? Tomas M. Hardy may well have done so, but we find it difficult to believe that John Hardy could have done it. The *espediente* is a petition signed Tomas Hardy, to the military commandant of the frontier of Sonoma for a grant of land, and is dated at Sonoma, September 20, 1843. Accompanying this is a document styled the loose paper, signed also by Tomas Hardy, which states that he arrived

at the Port of Vera Cruz in the year 1825, in the Victoria vessel of war, in the position of lieutenant of the same; that on various occasions he has rendered services to the Mexican nation in the same manner previously, and for this reason he is considered as naturalized. This statement may have been made of some Hardy who came to Vera Cruz on the Victoria in 1825, and entered into the maritime service of Mexico, but it was not true of John Hardy, who did not leave Canada until 1831, and who was in Natchez during the winter of 1836–7, as testified by Mr. Lindsay, and who never performed any maritime service for Mexico, so far as is proved by the evidence. We do not find evidence under this head to sustain a finding of the identity of John and Thomas Hardy.

2d. Nor do we find the case supported either by the evidence that the peculiarities of person of John Hardy were found in Thomas Hardy, or that Hardy's declarations respecting himself and the condition of his family afford any satisfaction on this point.

The testimony is unsatisfactory, both in the character of the witnesses testifying in some instances and as to the result of their evidence generally. An illustration of the extravagant absurdity of some of the witnesses is found in the evidence of Wm. B. Frazer, to which reference is made without reciting it.

The evidence of Hardy's statements regarding his nativity, his family, and his whereabouts in his previous life, are contradictory and uncertain. Several witnesses testify that he stated that he was born in Canada; a larger number state that he said he was from Canada; a still larger number testify that he told them he was born in England, and still a larger number either state that he said he was from England or was an Englishman. Baldridge says he told him he sat upon the mountains of Wales and saw ships sail out of Liverpool, and that he had been imprisoned in England for contempt of court.

It is proved that John Hardy was a carpenter and working on boats on the Mississippi as late as 1836–7, and yet Thomas Hardy stated that he had been sent to sea by his father at the age of fourteen, had sailed over the world in ships; that he had taken part in the revolutions in Peru and on one occasion had there commanded a battery of artillery.

Many witnesses testify that he spoke of the children he had left at home, while others testify that when sober he refused to speak of himself or his family.

Some testify that he spoke of his having a wife at home. Still

others that he said he left Canada on account of a dissension with his wife, while others make him refer to his children only.

John Hardy is described by his cousin, Thomas Hardy, as being five feet seven or eight inches high, weighing one hundred and sixty-five to one hundred and eighty pounds, eyes nearly black, "large, full, expressive, bright," hair black and curly, good-looking face, high forehead, bold and determined look, and when he laughed he did it heartily and showed it over his whole face, with a mark over his right eye about an inch above his eyebrow, having full and smooth voice, with distinct articulation, and a good singer. "He was the life of a company, quick tempered, but with fine feelings."

Mr. John Bidwell was called by the complainants to identify Hardy of Cache Creek as the father of the complainants. No witness called appears more favorably upon the record than Mr. Bidwell. He describes the Hardy he knew from 1843 to 1847, as being five feet seven or eight inches high, swarthy complexion, low forehead, full cheek bones, chin broad and blunt, his nose inclined to turn up, giving him an Irish or pugnacious appearance, upper lip short, mouth rather broad, broad, blunt chin. His manner was reserved and uncommunicative. Never heard of his singing; thinks he should have known it if he did. Spent many evenings with him but never heard him tell an anecdote and never saw him laugh. He says his eyes were of the gray order, hair dark, inclined to be gray, and thinks he had a scar on his face, but can't tell where. His manner was repulsive, and witness did not associate with him on account of his habits and disposition.

This description, if not positively repugnant to Thomas Hardy's, certainly affords no reason to suppose that the two men were identical. Departing from this reasonable description, we find nearly every characteristic of the human face and form attributed to Thomas Hardy, from the clumsy determination of Frazer at identification, to particulars totally different from those belonging to John Hardy. The general result of the evidence of John Hardy's family gives him black hair, dark eyes, large, full, and expressive, dark complexion, straight nose, a little broad on the top, pleasant, open countenance, bold and determined, a scar across his right eye, social disposition, genial and agreeable, of good habits and good moral character.

The testimony of many of the California witnesses called by the complainants describes Hardy of Cache Creek as having light hair and whiskers, nearly sandy, deep-set eyes, pug nose, with a scar

which some locate on his brow and some on his nose, silent, reserved, and ungracious in his manners, having the English peculiarity of omitting the *h* and aspirating the vowels, frequently drunk, and fond of the society of loose women. It is not intended to say that, among the great number of witnesses called by the complainants, there are not many who give the California Hardy the appearance, manners and conversations which tend to the belief that he was the father of the complainants. We are, however, clear and emphatic in the opinion that a consideration of the entire body of the testimony does not prove that Thomas Hardy, who died in California in 1848, was the man, John Hardy, who left Canada in 1831.

On the contrary, we are strongly inclined to the belief that it is proved affirmatively that the two men described were different men.

We have not attempted to analyze or to classify the three thousand folios of testimony which this record presents. It would be impossible to do so within the limits of an opinion of this court. We have, however, examined it carefully, and have no doubt of the correctness of the result we have reached.

This conclusion renders unnecessary a consideration of the other questions in the case, and leads to an affirmance of the decree dismissing complainants' bill.          *Affirmed.*

*Mr. Henry Beard, Mr. B. S. Brooks, Mr. N. P. Chipman, Mr. W. W. Chapman* and *Mr. C. T. Botts* for appellants.

*Mr. J. B. Harmon, Mr. E. Janin, Mr. E. L. Goold* and *Mr. J. P. Hoge* for appellees.